Filed 9/26/18

### CERTIFIED FOR PARTIAL PUBLICATION[*]

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of LAUNA and DAVID MORTON. | |
| LAUNA MORTON,<br><br>Appellant,<br><br>v.<br><br>DAVID MORTON,<br><br>Respondent. | F073689, F074243<br><br>(Super. Ct. No. S1501FL622454)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Stephen D. Schuett, Judge.

Michael R. Kilpatrick & Associates and Michael R. Kilpatrick for Appellant.

Law Offices of Edward J. Quirk, Jr., and Edward J. Quirk, Jr., for Respondent.

-ooOoo-

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II.C., II.D., II.G., II.H., II.I., and III. of the Discussion.

Launa Morton appeals from a judgment entered in a marriage dissolution proceeding, contending the trial court erred in determining (1) child support, (2) spousal support, (3) attorney fees, and (4) her former husband's interest in an oilfield service business was a gift from his father and, therefore, was his separate property even though acquired during the marriage.

The published parts of this opinion address issues related to determining the income available for child support and to awarding attorney fees under Family Code section 2030.[1]  First, we conclude Launa has established the child support award in the June 2016 judgment was based on the erroneous exclusion of respondent David Morton's income tax refunds from his net income available for child support.  Second, we conclude the exclusion of David's voluntary contributions to a 401(k) retirement savings plan from his net income available for child support was error, unless on remand the trial court provides findings that justify the exclusion of all or part of those contributions from David's income.  (See § 4059, subd. (c).)

As to attorney fees, we conclude the trial court erred in declining to award Launa additional attorney fees at the conclusion of the proceeding.  Pursuant to mandatory language added to section 2030, subdivision (a)(2) by the Legislature in 2010, "the court shall make an order awarding attorney's fees and costs" if the findings required by that subdivision "demonstrate disparity in access and ability to pay."  The issues on which the statute requires findings include "whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties." (§ 2030, subd. (a)(2).)  On a novel question of statutory interpretation, we conclude a trial court must make *explicit* findings on the issues listed in subdivision (a)(2) of section 2030.  Here, the record clearly demonstrates a "disparity in access and ability to pay" and, as a result, a further award of attorney fees and costs was mandatory.

---

[1]     All unlabeled statutory references are to the Family Code.

2.

The unpublished parts of this opinion resolve the following issues.  First, substantial evidence supports the trial court's explicit finding that David acquired the interest in his father's Huddleston Crane business as a gift and its implicit finding that the gift was not remuneratory.  Consequently, the trial court did not err in determining David's ownership interest in the business was his separate property.  Second, the questions involving the child support award in the June 2016 judgment are not moot.  Third, the calculation of that child support award erroneously failed to account for the percentage of time each party had custody of their daughter and did not properly analyze David's voluntary contributions to a health savings account (HSA) in determining his net income available for child support.  Fourth, as to permanent spousal support, the trial court's determination of David's income for purposes of evaluating his ability to pay support erroneously excluded David's California and federal income tax refunds and did not properly analyze David's voluntary contributions to a 401(k) plan and to a health savings account.  Fifth, the trial court's finding that David's net rental income is $7,650 per month—a finding that affects both the child support and the spousal support calculations—is supported by substantial evidence and, therefore, will be upheld.

We therefore reverse the judgment in part and remand for further proceedings regarding child support, spousal support and attorney fees.

**FACTS**

David was born in 1965, graduated from high school and attended Taft College for two years.  Starting in high school, David worked weekends and part time for his father's business, Huddleston Crane.  He finished college a few units short of receiving an AA degree in petroleum technology.  After college, David worked full time for Huddleston Crane as a mechanic, truck driver and crane operator.

Launa was born in 1967 and was employed as a hairdresser for approximately eight and one-half years.  Launa and David married in April 1991.  In March 1996, Launa stopped working because she was pregnant with their first child.  She was a stay-at-home

3.

mother for the rest of the marriage. They had two children, a son born in 1996 and a daughter born in early 1998. Launa and David separated in July 2012, after 21 years of marriage. In June 2016, their youngest child graduated from high school and was over the age of 18.

Huddleston Crane started doing business as an oilfield service company around 1940. David's father, John Morton (Father), acquired the business sometime before 1984 and owned and operated it as a sole proprietorship. When purchasing assets for the business, Father preferred to pay cash and was able to do so by accumulating profits and reinvesting them in the business. This approach avoided debt and was prudent because of the extreme volatility in the oilfield service business, which could result in dramatic variations in income from year to year.

*The Partnership*

In 1992, Father changed Huddleston Crane Service's form of business organization from a sole proprietorship to a partnership. According to his accountant, Father's goals were to (1) receive $10,000 per month from the business until he died or retired; (2) transfer ownership of the business to his son and son-in-law, David and David Noerr (Noerr),[2] without costing them anything and allowing them to continue to receive more than reasonable compensation for their services; and (3) structure the transaction to minimize or eliminate income and sales taxes. Father contributed the assets of the sole proprietorship to the partnership, which constituted 100 percent of its capital. The other two partners, David and Noerr, contributed no capital and their capital accounts started at zero. Father received the right to 10 percent of the partnership's future profits, while David and Noerr each received a right to 45 percent of future profits. The profits were credited to the partners' capital accounts. A partner's draws reduced his capital account.

---

[2]      Noerr married Tammy Morton, the daughter of Father and sister of David. Thus, Noerr was Father's son-in-law and is David's brother-in-law.

The record contains a copy of David's Schedule K-1 (Form 1065) from the partnership for the year ending December 31, 1993. The Schedule K-1 lists David's percentage of profits and losses at 45 percent and his ownership of capital at one percent. David's Schedule K-1 contains an "[a]nalysis of partner's capital account" that states (1) David's capital account at the beginning of the year was $1,095; (2) his share of income and loss was $23,275; (3) his withdrawals and distributions were $65; and (4) his capital account balance at year's end was $24,305. If the statement that David owned one percent of the partnership's capital was accurate, the total capital of the partnership at the end of 1993 was approximately $2.4 million.

*Huddleston Crane Services, Inc.*

On August 1, 1997, articles of incorporation for a corporation named "Huddleston Crane Services, Inc." were filed with the California Secretary of State. On September 1, 1997, at the first meeting of the board of directors of the new corporation, the directors adopted bylaws for Huddleston Crane Services, Inc. and Noerr was named board chairman, president, chief financial officer and secretary. David was named vice president. Father, David and Noerr each were issued 10,000 shares of stock. For tax purposes, Huddleston Crane Services, Inc. is a subchapter S corporation.[3]

Huddleston Crane Services, Inc. was formed as part of a reorganization of the partnership. This reorganization resulted in Father, David and Noerr become equal owners of the business. In effect, David exchanged the value in his capital account in the partnership and his right to 45 percent of future profits for a one-third ownership interest in the business's equity and future profits. Noerr made the same exchange. In

---

[3] An S corporation, like a partnership, does not pay income taxes. (*Heller v. Franchise Tax Bd.* (1994) 21 Cal.App.4th 1730, 1733 [tax treatment of S corporations]; *Valentino v. Franchise Tax Bd.* (2001) 87 Cal.App.4th 1284, 1287.) Instead, its income and losses are "'passed through'" on a pro rata basis to its shareholders, who report those items on their personal tax returns. (*Heller*, *supra*, at p. 1733.)

comparison, Father exchanged the value of his capital account and his right to receive 10 percent of future profits for a one-third ownership interest in the business's equity and future profits. The appellate record contains no evidence of the value of the partners' capital accountants immediately before the partnership's reorganization as a corporation. As a result, it is not possible to determine who, if anyone, the exchange favored.

*H.C.S. Mechanical, Inc.*

H.C.S. Mechanical, Inc. is a California corporation incorporated on January 4, 2000. The same day, its bylaws were executed by all four of its directors. H.C.S. Mechanical, Inc. issued 2,600 shares to Noerr, 2,500 shares to David, 2,500 shares to Butch Hall, and 2,400 shares to Dennis Perreault. These shareholders were the four original directors.

H.C.S. Mechanical, Inc. owns equipment that it rents to Huddleston Crane Services, Inc. for use.[4] For income tax purposes, H.C.S. Mechanical, Inc. is a subchapter S corporation.

Sometime no later than early 2006, David and Noerr had become the only shareholders and directors of H.C.S. Mechanical, Inc. Tax documents from 2011 state David owned 50 percent of the corporation's stock and Noerr owned the other 50 percent.

Papers filed by Launa in the trial court refer to "Huddleston Crane Services, Inc. and its wholly owned subsidiary HCS Mechanical, Inc."[5] This description of a parent-

---

[4] David's November 2012 declaration described Huddleston Crane as two companies—Huddleston Crane Services, Inc., the operating company, and H.C.S. Mechanical, Inc., which owns equipment used by the operating company.

[5] At times, it appears the trial court accepted this description. For instance, its August 31, 2015, ruling stated: "The sole issue before the Court is the characterization of Huddleston Crane Services, Inc. and its wholly owned subsidiary, HCS Mechanical, Inc. as community property or as David's separate property." In contrast, the court's March 2016 judgment uses less specific language to describe the relationship of the two corporations. It refers to David's 50 percent ownership interest "in Huddleston Crane Services, Incorporated, and its related entities, specifically including, HCS Mechanical, Incorporated." These documents and the other evidence in the record establish that

subsidiary relationship between the two corporations is not supported by the record. California's General Corporation Law (Corp. Code, § 100 et seq.) defines the terms "parent" and "subsidiary." (Corp. Code, §§ 175, 189.) When one corporation owns, directly or indirectly, more than 50 percent of the voting power of a second corporation, the second corporation is a "subsidiary" of the first. (Corp. Code, § 189, subd. (a); see Black's Law Dict. (8th ed. 2004) p. 367 ["parent corporation" means a "corporation that has a controlling interest in another corporation (called a *subsidiary corporation*), usu. through ownership of more than one-half of the voting stock"].)

Here, the corporate records show the shares of H.C.S. Mechanical, Inc. are owned directly by David and Noerr. Also, the tax returns in the record, including the 2011 Schedule K-1's (Form 1120S) for H.C.S. Mechanical, Inc. identify David and Noerr as shareholders. Schedule E to David's 2014 federal tax return show David receives income from both corporate entities, which implies the income from H.C.S. Mechanical, Inc. is received directly by David and is not channeled to him through a parent corporation. These documents and the other evidence in the record establish that H.C.S. Mechanical, Inc. is not a subsidiary (wholly owned or otherwise) of Huddleston Crane Services, Inc.

*Father's Exit from the Business*

Around 2004, Huddleston Crane Services, Inc. repurchased Father's shares in the corporation and retired those shares. After this repurchase, David and Noerr each owned 50 percent of the corporation's outstanding shares. Father died in 2007.

*Taft Property*

In 2004, David and Launa purchased just over six acres of real property in Taft, California. They paid $230,000 for the property and made an additional $200,000 in

---

H.C.S. Mechanical, Inc. is not a subsidiary (wholly owned or otherwise) of Huddleston Crane Services, Inc. Instead, both corporate entities are owned by David and Noerr, each owning 50 percent of each corporation's outstanding shares. There is no evidence in the record indicating the source of H.C.S. Mechanical's capital.

improvements. The property contains several out buildings, including two butler buildings, and corrals and stalls for the parties' horses.

In September 2012, David moved from the house to a detached garage, living there until June 2, 2013. David surrendered his key to the house, but continued to have access to the butler buildings, one of which contained his office. Launa retained possession and use of the residence and maintained the horses and other livestock that were community assets. The court ordered the property sold. In July 2015, it sold for $600,000. The property was no longer subject to a mortgage and each party received one-half of the net proceeds from the sale.

*David's Income*

The main sources of David's income are the wages he earns and the S corporation income. Tax returns for 2009 through 2011 show his wage income as $93,485, $88,653 and $81,083. The S corporation income reported on his income tax returns for these years was $313,671, $124,132, and $835,575. David's 2014 federal tax return reported wage income of $84,236 and S corporation income of $588,289.

David's cash flow is significantly less than the income reported on his tax returns because the S corporations retain a significant portion of the earnings for use as capital in the business.[6] The corporations distribute sufficient funds for David and Noerr to make the necessary quarterly estimated tax payments to both the federal government and California's Franchise Tax Board and to cover any tax owed on the final tax return. As to

---

**6** David's 2014 federal income tax returns show a $250,000 expense deduction pursuant to Internal Revenue Code section 179 (26 U.S.C. § 179). The deduction related to the nonpassive income of Huddleston Crane Services, Inc. That tax provision authorizes a taxpayer to elect to treat the cost of acquiring certain business assets as a cost (i.e., a current deduction) rather than depreciating that cost over the life of the asset. (See 26 C.F.R. §§ 1.179-1 to 1.179-6.) Thus, the tax deduction taken by David implies that Huddleston Crane Services, Inc. purchased depreciable assets in 2014 costing over $250,000. Tax returns filed by the parties before their separation show section 179 deductions of $103,332 (2008), $90,099 (2009), $250,000 (2010), and $14,500 (2011).

direct cash flow from Huddleston Crane Services, Inc., David and Noerr each receive two monthly checks—one for $6,100 and the other for $4,050—which David describes as "for equipment rental."

As to the 2014 cash flow from David's weekly paycheck of $2,113.77, that amount was reduced by total withholdings of approximately $400 for state and federal income tax, social security, Medicare and disability. The gross amount of the paycheck also was reduced by deductions for health insurance ($58.85), contributions to the 401(k) plan ($317) and contributions to a health savings account ($118). With these reductions, David's net pay came to approximately $1,220 per week. David's income and expense declaration dated January 12, 2015, stated the net amount of wages or salary received each month averaged $5,286.

## PROCEEDINGS

In August 2012, Launa filed a petition for dissolution of marriage. She also filed a request for pendente lite orders addressing (1) child custody, visitation and support; (2) spousal support; (3) property control; and (4) a business evaluation by a forensic accountant appointed pursuant to Evidence Code section 730.

In November 2012, Launa was awarded temporary spousal support of $6,000 per month and further hearings were scheduled. After evidentiary hearings in January and March of 2013, the trial court issued a written ruling on April 19, 2013. Temporary spousal support was reset at $3,029 per month. The court denied Launa's request to join Huddleston Crane Services, Inc. as a party and denied her request for an expert evaluation of the business. Based on the evidence presented up to that point, the court determined David's interest in the business was acquired by gift and, therefore, was separate property. The court stated: "Absent evidence of the community's interest in the corporation, the court does not believe it necessary or appropriate to value the business at this time."

At a July 2013 hearing on a motion to reconsider, a number of issues were discussed. The trial court clarified a point by stating its determination that David's interest the corporation was separate property was made without prejudice to the final characterization of that interest. The parties and court agreed the characterization of David's interest in the business would be addressed in a bifurcated trial after Launa conducted additional discovery.

In October 2013, the trial court entered findings and order after hearings that awarded Launa temporary child support of $981 for the parties' son and $1,634 for their daughter. The order also awarded temporary spousal support of $2,774 per month. The order included a DissoMaster report that showed the court's determinations of various factors relevant to calculating the support payments. The order denied without prejudice Launa's request for the valuation of Huddleston Crane Services, Inc. and any related corporations. The court concluded that the ownership interest of David was obtained as a gift from Father.

In December 2014, about a year and a half after David moved from the Taft property, he requested an order directing the sale of the residence. David also requested an order directing Launa to pay the community a *Watts* charge for the use of the property.[7]

In April 2015, evidentiary hearings were held on the issue of whether David's interest in the family business should be characterized as separate or community property. These hearings supplemented the testimony received during hearings held in January and March 2013. On August 31, 2015, the court filed its ruling, which included

---

[7]     Where one spouse has exclusive use of a community asset during the period between separation and trial, that spouse may be required to compensate the community for the reasonable value of its use. (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 978.) This compensation is commonly referred to as a "'*Watts* charge.'" (*Ibid*.; see *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 374 (*Watts*).)

10.

the findings that "David's interest in Huddleston Crane Services, Inc. was acquired by gift and that this interest is his separate property." On October 13, 2015, the trial court filed a judgment on reserved issues to implement its ruling as to the characterization of David's interest in the family business.

In March 2016, the court filed a judgment of reserved issues to implement the parties' stipulation as to the division of many other items of property. For example, the judgment stated two motorcycles and six all-terrain vehicles (ATV) belonged to their son, while a 2012 Polaris Razor, a 2006 Yamaha ATV, and 2006 Yamaha Blaster belonged to their daughter. Launa received (1) a 2011 Chevrolet Suburban, (2) a 1995 Chevrolet sedan, (3) a 2006 Schwinn motorcycle, (4) a 2004 Honda motorcycle, (5) six ATV's, (6) a 1996 Winnebago motorhome, (7) a 2004 Tommy utility trailer, (8) a 1997 Apache Carrier horse trailer, (9) three horses and tack, and (10) the furniture, furnishings, guns and shop tools then in her possession. Launa also received one-half of the remaining sale proceeds generated by the July 2015 sale of the family residence, subject to certain equalization charges and the subsequent determination of a *Watts* charge. She also received one-half of David's account in a 401(k) plan and one-half of a brokerage account maintained at Stifel Nicolaus. The 401(k) account had a balance of approximately $285,150 as of July 31, 2012, and the brokerage account had a balance of approximately $245,668 as of June 30, 2015.

The March 2016 judgment also confirmed the trial court's decision that the 50 percent ownership interest David held in Huddleston Crane Services, Inc. and its related entity, H.C.S. Mechanical, Inc., was David's separate property. In April 2016, Launa filed a notice of appeal from the March 2016 judgment for the purpose of challenging this characterization of David's interest in the family business.

The March 2016 judgment also identified six remaining issues, including child support for the daughter, permanent spousal support, and any *Watts* charge. These issues were submitted to the court on January 25, 2016, when briefing was completed.

11.

In April 2016, the court served a proposed statement of decision. Launa filed objections to the proposed statement of decision stating, among other things, that the decision did not address the issue of child support for the daughter, who had turned 18 earlier that year and was scheduled to graduate from high school on June 1, 2016. In May 2016, the trial court issued a ruling addressing the objections to the statement of decision. The ruling included a footnote stating: "The Court notes that it has made previous orders concerning the payment of child support by [David]. The existing orders for child support shall continue until statutory termination or further order of the Court." The ruling also denied Launa's request for an additional $115,134.65 in attorney fees and directed her counsel to prepare a judgment on the reserved issues for the court's signature.

On June 10, 2016, the trial court filed a judgment on reserved issues. The judgment continued the 2013 child support order, which required David to pay $1,634 in child support for his daughter until she reached the age of 18 and was not a full-time high school student. As to spousal support, the judgment directed David to pay Launa $2,700 per month beginning on April 1, 2016, until statutory termination or further order of the court. As a charge for Launa's exclusive use of the family residence for approximately 25 months, the court determined Launa should reimburse the community in the amount of $25,000. The judgment also reflected the court's denial of Launa's request for additional attorney fees.

In August 2016, Launa filed a notice of appeal from the judgment entered on June 10, 2016. She also requested this court to consolidate the appeal (case No. F074243) with her earlier appeal from the March 2016 judgment (case No. F073689). We granted her request and directed that only one record on appeal be prepared for the consolidated matters.

**DISCUSSION**

I.    CHARACTERIZATION OF THE BUSINESS[*]

Launa contends that David's interest in Huddleston Crane Services, Inc. is community property based on two alternate theories. First, she argues the interest was not obtained as a gift and, therefore, was not separate property. Second and alternatively, Launa argues David's interest was community property because it was obtained as a remuneratory gift.

A.    General Principles

1.    *Separate and Community Property*

Characterization of property for purposes of California's community property law refers to the process of classifying property as separate, community or quasi-community. (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 291 (*Haines*).) This classification process is necessary to determine the rights of each spouse and is an integral part of the division of property on marital dissolution. (*Ibid.*)

A fundamental rule of California's community property system is that all property acquired during marriage is community property unless it comes within a specific exception. (*Haines*, *supra*, 33 Cal.App.4th at p. 289.) Some of the major exceptions to this rule identify circumstances in which the item qualifies as separate property. (*Ibid.*)

Sections 760 and 770 establish the general rule about community property and the exceptions for separate property. Section 760 defines community property by stating: "Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." This statute is the basis for "a general presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source." (*Haines*, *supra*, 33 Cal.App.4th

---

[*]    See footnote, *ante,* page 1.

at pp. 289–290.) The presumption is recognized in section 802, which refers to the "presumption that property acquired during marriage is community property."

Separate property is addressed in subdivision (a) of section 770, which provides: "Separate property of a married person includes all of the following: [¶] (1) All property owned by the person before marriage. [¶] (2) All property acquired by the person after marriage by gift, bequest, devise, or descent. [¶] (3) The rents, issues, and profits of the property described in this section." The provision is based on the California Constitution, which states that "[p]roperty owned before marriage or acquired during marriage by gift, will or inheritance is separate property." (Cal. Const., art. I, § 21.)

The general community property presumption is rebuttable. "[V]irtually any credible evidence may be used to overcome it, including … presenting evidence the item was acquired as a gift." (*Haines*, *supra*, 33 Cal.App.4th at p. 290.) In this case, David contends he overcame the presumption by presenting evidence that his interest in the business was acquired as a gift from Father.

### 2.      *Character Fixed at Acquisition*

The statutory references to "property … acquired by a married person during the marriage" and "property owned by the person before marriage" establish that the time of acquisition is an important, fundamental factor in characterizing the property. (§§ 760, 770, subd. (a)(1); *Haines*, *supra*, 33 Cal.App.4th at p. 291.) It is well settled that the character of the property is fixed as of the time it is acquired and its character continues until it is changed in a manner recognized by law, such as by agreement of the parties. (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 732 (*Rossin*).)

### 3.      *Accrual of Profits*

If property was separate at the time of acquisition, "'it continues to remain so with the exception of such increase thereof as may have been due to the contributions of the community by virtue of capital or industry.'" (*Rossin*, *supra*, 172 Cal.App.4th at p. 733.)

In 1971, our Supreme Court acknowledged the general principle that profits accruing from a spouse's separate property also are separate property and then set forth the following principles:

> "[L]ong ago our courts recognized that, since income arising from the husband's skill, efforts and industry is community property, the community should receive a fair share of the profits which derive from the husband's devotion of more than minimal time and effort to the handling of his separate property. [Citations.] Furthermore, while this principle first took root in cases involving a husband's efforts expended in connection with a separately owned farm or business [citations] our courts now uniformly hold that '[a]n apportionment of profits is required not only when the husband conducts a commercial enterprise but also when he invests separate funds in real estate or securities. [Citations.]' [Citations.] Without question, Mr. Beam's efforts in managing his separate property throughout the marriage were more than minimal [citations], and thus the trial court was compelled to determine what proportion of the total profits should properly be apportioned as community income." (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 17 (*Beam*).)

In this case, the allocation of profits to David's efforts during the marriage was an issue presented to the trial court. On appeal, Launa does not contend the trial court erred when it analyzed the allocation issue under the principles set forth in *Beam*. Applying these principles, the court determined the evidence did not establish (1) an increase in value from acquisition to separation or (2) how the court should apportion any increase in value.

### 4. Elements of a Gift

Civil Code section 1146 states "[a] gift is a transfer of personal property, made voluntarily, and without consideration." Civil Code section 1147 states a verbal gift is not valid unless the means of obtaining possession and control of the thing are given. Also, if the gift is capable of delivery, there must be an actual or symbolic delivery of the thing to the donee. Civil Code section 1148 provides that a gift cannot be revoked by the giver. Taking these statutory provisions into account, California case law defines the element of a gift as "(1) competency of the donor to contract; (2) a voluntary intent on the

part of the donor to make a gift; (3) delivery, either actual or symbolical; (4) acceptance, actual or imputed; (5) complete divestment of all control by the donor; and (6) lack of consideration for the gift." (*Jaffe v. Carroll* (1973) 35 Cal.App.3d 53, 59.)

### 5. *Standard of Review*

Generally, the trial court's findings of fact related to whether a particular item is separate or community property is reviewed on appeal under the substantial evidence standard. (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 849.) Where the facts are undisputed, the application of legal principles to those facts are subject to de novo review. (See *Rossin, supra,* 172 Cal.App.4th at p. 734 [in certain situations the issue of the characterization given property is predominantly one of law subject to de novo review].) These general principles apply to the specific questions presented here— namely, whether the transfer of the interest in the Huddleston Crane Service's business from Father to David was a gift and, if so, whether the gift was remuneratory.

### B. The Transfer Was a Gift

### 1. *Trial Court's Findings*

The trial court found that Father converted the business from a sole proprietorship to a partnership in 1992, which was after David and Launa were married on April 6, 1991. The capital account for Father contained 100 percent of the equity in the business and the capital accounts of David and Noerr were zero. As to future profits of the partnership, Father was to receive 10 percent, while David and Noerr were each to receive 45 percent. The profits were to be credited to the capital accounts. A partner's capital account would be reduced by any draws taken by him. No gift tax return was filed because Father's accountant concluded the amount of any gift was below the reporting threshold.

In 1997, the partnership was reorganized as a California corporation, with Father, David and Noerr becoming equal owners of the corporation's stock. In effect, David and

Noerr each exchanged the value in their capital account and their right to 45 percent of future profits for a one-third ownership interest in the business's equity and future profits.

Prior to Father's death in 2007, David and Noerr became equal owners of the corporation's outstanding shares as a result of the corporation purchasing and retiring the shares owned by Father. The repurchase of Father's shares was completed in approximately 2004.

One of the theories pursued by Launa in the trial court was that there was no gift because she and David purchased the interest. Launa testified that she and David paid $7,500 per month over 10 years, starting in 1992, for their share in the business. The trial court found her testimony about a purchase was not credible. Instead, the court found the conflicting testimony of David, Noerr and their accountant credible. They testified that there was no purchase.

In addition, the court explicitly found that "David's interest in Huddleston Crane Services, Inc. was acquired by gift and that this interest is his separate property." The court did not explicitly address Launa's remuneratory gift theory. The court did make findings relating to whether the community was entitled to receive a share of the profits and increase in value of the business under the theory that some or all of the profits and increase were derived from David's personal efforts. (See *Beam*, *supra*, 6 Cal.3d at p. 17.) In addressing this theory, the court found: "David has earned a comfortable living from Huddleston Crane Services, Inc. receiving a salary of $5,265 per month…. There was no evidence to suggest David was not paid a salary that reflected the value of the work he performed to Huddleston Crane Services." The court also stated, "there is no evidence before the Court to establish that there has been an increase in value of Huddleston Crane Services from the time that David acquired his interest to the date of separation."

## 2. *Divestment of Control*

Launa contends there was no gift because the transfer was not outright—that is, Father did not completely divest himself of all control. (See *Jaffe v. Carroll*, *supra*, 35 Cal.App.3d at p. 59.) Specifically, Launa contends Father failed to deliver and divest himself of complete dominion and control over David's 45 percent share of profits. Launa argues this fact is established by Father reclaiming a portion of the profits, which happened when the partnership was reorganized as a corporation and Father's interest in the profits increased from one-tenth to one-third.

The weakness in Launa's argument is that it identifies what might have happened, but the scenario she describes is not the only reasonable possibility. The other possibilities are that (1) the reshuffling of interests was a fair trade or (2) David and Noerr came out in a better position. If the latter occurred, Father may have made another gift to David. Choosing among these possibilities is difficult because there is no evidence as to the balances in the capital accounts of Father, David and Noerr at the time of the reorganization. Therefore, the evidence does not establish that David and Noerr came out of the reorganization in a worse position and Father came out in a better position, which would support the inference that Father retained control of their profit interests.

To summarize, the evidence presented did not compel the trial court to find that Father retained control over the 45 percent interest in future profits that he transferred to David in 1992. Stated from another perspective, the evidence adequately supports the inference that Father divested himself of control of the interests he transferred to David and Noerr.

## 3. *Receipt of Consideration*

Launa also contends there was no gift because Father "was using the profits of the business to receive consideration for his interest in this business. There was not a lack of consideration, another required legal element of a gift." (See *Jaffe v. Carroll*, *supra,* 35

Cal.App.3d at p. 59 [a gift requires the lack of consideration].) This argument fails from an accounting perspective. The money paid to Father out of the partnership was a draw on his capital account, as is explained in the accountant's November 2012 testimony and his December 2012 declaration. In short, this evidence supports the finding that Father was cashing out his retained ownership interest, not receiving consideration for the 45 percent profit interests he transferred to David and Noerr.

In addition to the foregoing theory about Father's receipt of consideration, Launa argues the transfer of a portion of future profits to David and Noerr was in consideration of their future services whereby Noerr would leave his job to become a partner and David would and did continue to work excess hours in the business. There is no direct evidence that Father conditioned the grant to David of a 45 percent interest in the business's profits on David's promise to continue to work for the business. For example, there is no evidence of an agreement that if David was injured and could not continue to work for the business, his 45 percent interest in the profits would have been revoked. In contrast, there is evidence that the business was to be held in the family, which supports the inference that the transfer to David was a gift and not part of a bargained for exchange in which David committed to continue to work for the business. In addition, David and Noerr testified that it was their understanding that they would be gifted an interest in the business for no consideration. Therefore, the evidence supports the inference that Father did not receive any consideration from David, such as a promise to render future services, in exchange for the ownership interest transferred to David.

Launa also argues David must have provided consideration for his 45 percent of future profits because Noerr provided consideration in the form of agreeing to quit his job and come work for the business. We reject this argument because it is reasonable to infer that Father gave his son—his direct offspring who already was working for the business—more lenient terms than his son-in-law. In other words, Father may have made the transfer to his son-in-law contingent upon Noerr coming to work for the business and

19.

imposed no similar continuing obligation on his own son. Thus, the trial court was not compelled to infer the transfer to David was in exchange for an agreement to continue to work for the business because the transfer to Noerr was made after Noerr agreed to come work for the business. Under the substantial evidence standard of review, when conflicting reasonable inferences are possible, the appellate court may not reweigh the evidence and accept inferences that were rejected by the trial court. (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 623 [when the evidence supports conflicting reasonable inferences, the appellate court must accept the trial court's findings].)

### 4. *Accountant's Testimony*

Mac Parsons is a certified public accountant who provided services to Father from 1984 until his death in 2007. Parsons served as the accountant for (1) Huddleston Crane Services in it various business forms, (2) the Noerrs, and (3) David and Launa. The trial court's order stated, "Parsons' testimony indicated that the original grant of an ownership interest through the formation of the partnership between [Father], David and David Noerr was a gift from [Father] to his son and son-in-law."

In her opening brief, Launa argues the accountant never testified the transaction was a gift and, even if he had, it would have been a legal conclusion that "does not constitute substantial evidence." In her reply brief, Launa argues "[n]o substantial evidence supported the court's finding of a gift based on the CPA's legal conclusion."

First, one main point of the accountant's testimony was that no consideration was paid by David and Noerr for the transfer of the 45 percent profit interests—an issue that was disputed in the proceedings below. The accountant's testimony corroborated the testimony of David and Noerr and contradicted Launa's testimony about payments being made by David to Father.

Second, Launa appears to argue that the trial court misconstrued the accountant's testimony or, alternatively, relied on the accountant's legal conclusion about the existence of a gift. We interpret the trial court's use of the word "indicated" in reference to the accountant's testimony about the original grant to mean that the testimony did not explicitly state the grant was a gift, but provided circumstantial evidence reasonably supporting the inference that the transfer to David was not a gift. In other words, it was possible to draw inferences from the accountant's testimony that supported finding the transfer to David was a gift. For instance, as to whether the transfer from Father to David and Noerr was voluntary or compelled from some reason, the accountant testified that he knew of no reason that it would be compelled. Stated another way, the accountant did not know of a prior agreement or other legal obligation that compelled Father to make the transfer to David. The accountant also explained why a gift tax return was not filed, stating it was "fair to assume" the transfer was not over the minimum amount that required the file of a gift tax form with the Internal Revenue Service. The court, in its role as trier of fact, could reasonably interpret the phrase "fair to assume" to mean it was reasonable to infer from the circumstances that the accountant was able to remember after 20 years that the value of the gift did not exceed the filing threshold. As to the possibility that the accountant offered his legal opinion as to whether the grant to David was a gift, we have located no such testimony in the record and Launa admits she could not find any such testimony. Thus, the trial court did not rely on a legal opinion of the accountant when the court found the transfer was a gift.

C.    Remuneratory Nature of the Gift

1.    *Launa's Contentions*

Launa contends that if the transfer to David was a gift, it was a remuneratory gift and thus community property. She relies on *Downer v. Bramet* (1984) 152 Cal.App.3d 837 (*Downer*), a case setting forth the principle that a remuneratory gift should be

characterized as community property. The principle recognizes that sometimes employers make transfers to employees that appear to qualify as gifts (i.e., are voluntary and without consideration), but the transfer is regarded as remunerative for services rendered to the employer and the property is characterized as community property to the extent those services were rendered during the marriage. (*Id*. at p. 844.) Here, Launa argues any gift was remuneratory because the transfer was in recognition of, and dependent upon, David's working for the business and his ongoing labor, skill and effort.

### 2. *Principles Governing Remuneratory Gifts*

In *Downer*, the parties were married in 1953 and separated in 1971. (*Downer*, *supra*, 152 Cal.App.3d at p. 839.) In August 1972, the former husband's employer transferred a one-third interest in a ranch to him, with similar portions going to two other employees. (*Id*. at pp. 839–840.) The husband had worked for the employer since 1943 and had become the employer's righthand man, providing services to several corporate entities and supervising ranch operations in California, Arizona and Oregon. (*Id*. at p. 843.) For over 30 years, he was a loyal and trusted employee with practically no social contacts with his employer. (*Id*. at p. 843–844.) In 1976, the husband stopped working after suffering a stroke. (*Id*. at p. 840.) The parties' dissolution settlement had been executed near the end of 1972 and the husband had not informed his spouse about the August 1972 transfer of the ranch prior to the execution of that agreement. In 1980, when she learned about the transfer, the former wife filed suit to claim a community property share of the proceeds from the sale of the ranch. (*Id*. at p. 841.)

In *Downer*, the appellate court first considered whether the transfer was a gift. The court agreed with the trial court that the transfer of the "interest to former husband was legally in the form of a gift." (*Downer*, *supra*, 152 Cal.App.3d at p. 843.) The court concluded the transfer was "'made voluntarily, and without consideration'" because there was no legal obligation to transfer the ranch and no evidence the former husband was

22.

induced to stay in the job based on statements purportedly made that the ranch would be conveyed to the three employees in lieu of a pension program. (*Ibid*.) The court then concluded the determination that the conveyance was legally a gift did not ultimately decide its characterization as separate or community property. (*Ibid*.) The court stated the statutory language about gifts being separate property "must be read in the context of the entire marital property scheme. Earnings or property attributable to or acquired as a result of the labor, skill and effort of a spouse during marriage are community property." (*Ibid*.) Based on the strong evidence that the gift was made by the employer "in recognition of former husband's devoted and skillful services during his lifelong employment," the court concluded the grant of nonsuit was error. (*Ibid.*) The basic principles about remuneratory gifts are contained in the following paragraph:

> "Thus, although the conveyance of the ranch interest to former husband was in the form of a gift, the evidence would support, indeed strongly suggests, that it was in whole or part a remuneratory gift in recognition of former husband's loyal and skilled efforts for and services to his employer. [Citations.] To the extent it was and to the extent the efforts and services were rendered during the marriage [citations], the ranch interest conveyed to former husband and the proceeds of its sale were community property. [Citations.]" (*Id.* at p. 844.)

### 3. *Application of Principles*

The trial court impliedly found the transfer of an ownership interest in the business to David was not a remuneratory gift. This implied finding is supported by substantial evidence. As discussed earlier, the circumstantial evidence supports the inference that the transfer to David was not conditioned on his continuing to work for the business. As an appellate court, we must accept inferences that are favorable to the trial court's order and cannot reweigh the evidence. Therefore, Launa has not established that the transfer to David was in recognition of past and future services. Consequently, she has not established the gift was remuneratory and we conclude the trial court did not err in

23.

determining the ownership interest transferred from Father to David was separate property.

II.     CHILD SUPPORT

    A.     <u>Basic Principles</u>

        *1.     Statewide Child Support Guideline*

Child support awards in California are governed by the legislation that established a statewide uniform child support guideline. (See §§ 4050–4076.) "The court shall adhere to the statewide uniform guideline and may depart from the guideline only in the special circumstances" identified in the statute. (§ 4052.) The child support guideline is a mathematical formula set forth in section 4055 and the amount generated by the formula is presumptively correct. (§§ 4053, subd. (k), 4057, subd. (a).) The presumption can be rebutted with evidence of the factors set forth in section 4057, subdivision (b).

The "total net monthly disposable income of both parties" is a component of the formula used in the statewide uniform guideline for determining child support. (§ 4055, subd. (b)(1)(E).) Monthly net disposable income usually is computed by dividing the annual net disposable income by 12. "The annual net disposable income of each parent shall be computed by deducting from his or her annual gross income the actual amounts attributable to" items listed in the statute. (§ 4059.) Those deductions include (1) state and federal income tax liability, (2) contributions to the Federal Insurance Contributions Act (FICA), (3) amounts paid for retirement benefits if participation is required as a condition of employment, and (4) health insurance or health plan premiums for the parent or any children the parent is obligated to support. (§ 4059, subds. (a)–(d).) The term "annual gross income," which is used in the calculation of annual net disposable income, is defined in section 4058 to mean income from whatever source derived, except child support payments actually received and income derived from any need-based, public assistance program. (§ 4058, subds. (a), (c).)

## 2. Standard of Review

Child support awards are reviewed for an abuse of discretion. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282 (*Cheriton*).) In conducting this review, appellate courts determine whether the trial court's factual findings are supported by substantial evidence and whether the trial court reasonably exercised its discretion—that is, whether any judge reasonably could have made such an order. (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730–731 (*Alter*).)

The concept of a reasonable exercise of discretion means that trial courts must follow established legal principles. (*Alter*, *supra*, 171 Cal.App.4th at p. 731.) In the context of child support awards, which are highly regulated by the statewide uniform guideline, the only discretion trial courts possess is the discretion provided by statute or rule. (*In re Marriage of Smith* (2001) 90 Cal.App.4th 74, 80–81.)

## B. Trial Court's Determinations

### 1. Temporary Support

The court's October 2013 order established the amount of temporary support[8] for the two minor children at $2,615 per month commencing on August 13, 2012. The order directed the payment of child support until a further order of the court, until the child reached age 19, or until the child reached age 18 and was not a full-time high school student, whichever occurred first. The child support consisted of $981 per month for the son born in 1996 and $1,634 for the daughter born in 1998.

The order included a DissoMaster report for 2013, which had entries for both presumed and basic child support of $2,615. The DissoMaster report listed David's other nontaxable income and his net (adjusted) income at $12,968 per month. It also listed David's net spendable income at $7,579, which equaled his net (adjusted) income of

---

[8] The terms "interim," "pendente lite" and "temporary" are used interchangeably in describing temporary support orders. (*In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 639.)

$12,968 minus $2,615 in child support and $2,774 in spousal support. The net (adjusted) income figure of $12,968 per month was based on (1) $5,001 in wages available for support, (2) net rental income of approximately $7,650 ($10,150 less a $2,500 payment to David's mother), (3) one-half of the miscellaneous interest and dividend income of $1,800, minus (4) other adjustments.

### 2.  Permanent Support

In October 2015, the trial court held a bench trial on the remaining issues not resolved by the parties' stipulation, which included child support for the daughter and permanent spousal support. In April 2016, the court served a proposed statement of decision. Launa filed objections to the proposed statement of decision stating, among other things, that the decision did not address the issue of child support for the daughter, who had turned 18 earlier that year. Launa's objection represented to the court that the daughter was scheduled to graduate from high school on June 1, 2016.

In May 2016, the trial court issued a ruling addressing the objections to the statement of decision. The ruling included a footnote stating: "The Court notes that it has made previous orders concerning the payment of child support by [David]. The existing orders for child support shall continue until statutory termination or further order of the Court."

On June 10, 2016, the trial court filed a judgment on reserved issues. The judgment continued the 2013 child support order by requiring David to pay $1,634 in child support for his daughter until she reached the age of 18 and was not a full-time high school student.

### C.  Mootness of Challenges to Permanent Child Support[*]

David responds to Launa's various challenges of the child support order contained in the June 2016 judgment by contending those challenges are moot because the

---

[*]  See footnote, *ante,* page 1.

26.

temporary child support terminated before the June 2016 judgment went into effect. David asserts his support obligation for his daughter terminated on June 1, 2016, when she graduated from high school and, therefore, the child support order in the June 10, 2016, judgment never required him to make any payments.

Whether the child support issues raised by Launa are moot presents a threshold question. Consequently, we address mootness before reaching Launa's contentions about the errors in the child support order.

### 1. Basic Principles

Courts decide only justiciable issues. (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573.) Justiciability means the questions litigated are based on an actual controversy. (*Ibid*.) Unripeness and mootness describe situations where there is no justiciable controversy. (*Ibid*.) Unripe cases are those in which an actual dispute or controversy has yet to come into existence. (*Ibid*.) At the other end of the spectrum, mootness occurs when an actual controversy that once was ripe no longer exists due to a change in circumstances. (*Ibid*.)

Under California law, the test for mootness of an appeal is whether the appellate court can grant practical, effective relief despite the change in circumstances. (*Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340, 362; see *In re Marriage of Olson* (2015) 238 Cal.App.4th 1458, 1463; *Lester v. Lennane* (2000) 84 Cal.App.4th 536, 566.) We conclude this test for mootness under California law applies to orders granting or denying child support under the Family Code.

### 2. Child Support Judgment

The daughter of David and Launa turned 18 years of age in early 2016 and subsequently graduated from high school on June 1, 2016. Pursuant to the terms of the judgment filed on June 10, 2016, David's obligation to pay child support for his daughter terminated once she was 18 and had graduated from high school. Thus, when the

judgment was filed, David no longer was obligated to pay child support. Any relief entered by this court to vacate or alter the child support order in the judgment would have a practical impact on the child support obligation only if that relief would apply to payments made before the termination event—that is, the daughter's high school graduation.

### 3. Retroactive Changes to Child Support

David's theory of mootness is based on the general principles that (1) modifications of temporary child support orders cannot be retroactive and (2) the operative date of a support order is the moment of pronouncement if the court does not state a commencement date. David argues the moment of pronouncement in this case is June 10, 2016, when the judgment was filed.

Launa argues the issue of child support is not moot because this court can (1) require the errors in the calculations of that support be corrected and (2) direct the trial court to exercise its discretion regarding retroactivity and determine a commencement date for the increased child support. Launa suggests that November 1, 2015—the first month after the October 2015 trial—would be an appropriate commencement date and would be consistent with the stipulation of the parties that 20 percent of the daughter's time was spent in David's custody. At the beginning of the October 30, 2015, court trial on the remaining issues, the court and counsel discussed which issues remained for the court to decide. Those issues included child support and spousal support.

First, we conclude the trial court had the discretion to establish a date prior to the entry of the judgment when the permanent child support order would take effect. (§ 3653, subd. (a) [retroactive application of modification of support order]; see *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1052 [discretion to make order modifying child support retroactive].) Here, the trial court ordered a continuation of the temporary child support and, as a result, had no reason to exercise its discretion relating

28.

to a commencement date for a modification to the previous support order. If Launa establishes one or more errors as to the amount of child support ordered in the June 2016 judgment, it will raise the question of when the corrected amount should have taken effect. The statute authorizes retroactivity of a modified support order to "the filing of the notice of motion or order to show cause to modify" the support. (§ 3653, subd. (a).) The purpose of the notice of motion or order to show cause is to put the other parent on notice that the support order could be changed and to allow that parent to plan for the possibility. Here, prior to the October 30, 2015, court trial on remaining issues, both parties filed a trial brief on remaining issues that mentioned child support as a remaining issue. These trial briefs clearly fulfilled the function of providing David notice that his child support obligation might change. Accordingly, we conclude the trial briefs are the functional equivalent of "the filing of the notice of motion or order to show cause to modify" child support for purposes of section 3653, subdivision (a). Requiring Launa to file a notice of motion or order to show cause at that point would have added additional paperwork to the court's file and served no practical purpose. Therefore, we conclude the trial court had the discretion to make any modification of the support order retroactive to the filing of Launa's trial brief.

Second, we conclude an appellate court decision directing the trial court to exercise discretion is a type of practical, effectual relief. (Cf. *In re Marriage of Rosenfeld & Gross* (2014) 225 Cal.App.4th 478, 491 [order denying request for modification of child support reversed with directions for trial court to consider evidence relevant to exercise of its discretion].) Accordingly, a remand order directing the trial court to exercise its discretion relating to the retroactivity of a child support modification would provide practical, effective relief. Consequently, under California's mootness doctrine, the question of whether the child support order in the June 2016 judgment contains error is not moot.

D.    2016 Child Support—Custody Percentages[*]

Launa contends the trial court's decision in 2016 to continue the temporary child support ordered in October 2013 contained multiple errors relating to the calculation of David's income available for support.  In addition, Launa contends the court failed to implement the parties' stipulation attributing a 20 percent time share to David, the noncustodial parent.  Here, we consider the latter contention.

One of the findings used in the DissoMaster report attached to the trial court's October 2013 order was that the children spent 49 percent of their time with David.  During the October 30, 2015, trial, the parties stipulated that David's share of their daughter's custody was 20 percent and the court stated it would accept this stipulation.  Despite the stipulation and the court's statement, the 2016 judgment simply continued the child support ordered in October 2013, which was based on DissoMaster calculations attributing a 49 percent share of custody to David.  It follows that (1) the trial court's 2016 judgment failed to incorporate the parties' stipulation and (2) the child support award of $1,634 per month is tainted by the error relating to custody percentages.  Consequently, the issue of child support must be remanded to the trial court for recalculation using the correct custody percentages.  Also on remand, the court must exercise its discretion as to the retroactivity of the recalculated child support obligation.

E.    2016 Child Support—Tax Refunds

1.    *Statutory Provision and Its Meaning*

As described in part II.A.1., *ante,* the calculation of a parent's net disposal income involves reducing the parent's annual gross income by deducting items specified in the statute.  (§ 4059.)  One of those deductions is "the *actual* amounts attributable to … [t]he state and federal income tax *liability* resulting from the parties' taxable income." (§ 4059, subd. (a), italics added.)  Subdivision (a) of section 4059 also states:

---

[*]    See footnote, *ante,* page 1.

30.

"Federal and state income tax deductions shall bear an accurate relationship to the tax status of the parties (that is, single, married, married filing separately, or head of household) and number of dependents. State and federal income taxes shall be those *actually payable* (not necessarily current withholding) after considering appropriate filing status, all available exclusions, deductions, and credits." (Italics added.)

This text makes no reference to income tax refunds. Consequently, the following question of statutory construction is presented: When a trial court has excluded all of a parent's income tax withholdings and estimated income tax payments from that parent's income, how should the court treat income tax refunds when calculating a parent's annual net disposable income under section 4059? As explained below, we conclude the state and federal income tax refunds should be included in the annual net disposable income.

This question of statutory construction involving income tax refunds and section 4059 does not appear to have been answered in a published decision. Consequently, we begin with the words used in the statute, giving them their usual and ordinary meaning, because statutory language generally is the most reliable indicator of legislative intent or purpose. (*People v. Castillolopez* (2016) 63 Cal.4th 322, 329.) When statutory language is ambiguous, courts must adopt the interpretation that best effectuates the legislative intent or purpose. (*Beal Bank, SSB v. Arter & Hadden, LLP* (2007) 42 Cal.4th 503, 508.)

The words of particular interest include the phrase "actual amounts attributable" in section 4059's lead-in to the specific deductions. (§ 4059.) Also, the word "liability" is used in the income tax deduction's reference to "state and federal income tax *liability*." (§ 4059, subd. (a), italics added.) Most significant for our purposes is the phrase "actually payable" in the sentence that contrasts taxes actually payable with current withholding for taxes. That sentence provides: "State and federal income taxes shall be those *actually payable* (not necessarily *current withholding*) after considering appropriate filing status, all available exclusions, deductions, and credits." (§ 4059, subd. (a), italics added.)

31.

The amounts withheld for state and federal income taxes on a taxpayer's W-2 and 1099 forms and the amounts of the quarterly estimated tax payments to California (form 540-ES) and the federal government (form 1040-ES) are not the "actual amounts attributable" to "state and federal income tax liability" and are not the taxes "actually payable." (§ 4059, subd. (a).) The statute explicitly contrasts taxes actually payable with current withholdings and warns that they are not necessarily the same. Instead of representing the actual amount of a parent's tax liability (i.e., the amount actually payable), the amounts withheld and the amounts of estimated tax payments are intended to cover most or all of the taxpayer's final tax liability—a liability calculated on income tax returns prepared after the close of the tax year and usually filed on or before the 15th of April. Consequently, the amounts withheld and the amounts of estimated tax payments are estimates or predictions related to an income tax liability that ultimately will be determined sometime after the amounts have been withheld and the estimated payment submitted. Therefore, we conclude that the subtraction of withholdings and estimated tax payments from the parent's gross income does not end the calculation set forth in subdivision (a) of section 4059. Refunds amounts must be taken into account.

The Legislature's recognition that taxes actually payable are not necessarily equal to current withholdings is consistent with judicial decisions in child support cases from other jurisdictions. Those cases have recognized the inaccuracy of withholdings when addressing how income tax refunds relate to the income used to calculate child support payments. (See e.g., *Ready v. Ready* (Wyo. 2003) 76 P.3d 836 [1999 overpayment caused significant tax refund to be received in 2000; refund was included in income used to calculate father's child support obligation] (*Ready*); *In re Marriage of Pylawka* (1996) 277 Ill.App.3d 728, 733 [661 N.E.2d 505, 509] [income tax refund should be added back to parent's net income when determining child support obligation under Illinois statute] (*Pylawka*).)

32.

The Illinois child support statute provides a comparison useful in this case because it allows for the deduction of federal income tax from *gross* income to determine the parent's *net* income used for purposes of calculating child support. (*In re Marriage of Ackerley* (2002) 333 Ill.App.3d 382, 390–391 [775 N.E.2d 1045, 1053–1054]; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 504, p. 567 [persuasive value of decisions of sister state courts].) To address overwithholding of salary or wages on a parent's W-2 forms, Illinois courts use two approaches. (*Ackerley, supra,* at pp. 1053–1054.) The first calculates a parent's net income by deducting the actual federal income tax paid from the actual total income received. (*Ibid.*) The second "begin[s] with net income and add[s] back in any refunds, which represent overwithholding." (*Ibid.*) The approaches recognize that if income tax refunds were excluded from the calculations, it would allow a parent owing a support obligation to manipulate his or her net income simply by overwithholding. (*Pylawka*, *supra*, 661 N.E.2d at p. 509.) The potential for inaccuracy or manipulation also was recognized by the Wyoming Supreme Court:

> "A review of the record in this case shows that the court considered the father's receipt of a significant tax refund in 2000 for overpaid 1999 taxes as a matter affecting his cash flow during the year 2000. The father would have us base his child support obligation not on his actual after-tax income, but rather on an income that is artificially reduced by temporary overpayment of taxes. That would not comport with the statutory and case law definitions of income." (*Ready*, *supra*, 76 P.3d at p. 840.)

Based on the text of section 4059 and the tax refund cases from other jurisdictions, we conclude California's statute requires the parent's state and federal income tax refunds to be added to the parent's annual net disposable income when all of the parent's income tax withholdings and estimated income tax payments have been deducted from his or her gross income. A contrary statutory interpretation would allow a parent to manipulate his or her income by overwithholding or overpaying estimated tax payments.

## 2. Tax Payments and Refunds—2008 to 2011

The evidence in this case includes the parties' *federal* tax returns from 2008 through 2011, the four years prior to the filing of the dissolution proceeding in 2012. Those tax returns show they overpaid their federal income tax in 2008 ($17,294) and 2010 ($28,403). The 2008 overpayment was applied to the next year's taxes and $17,905 of the 2010 overpayment was taken as a refund. In contrast, their withholdings and estimated tax payments for 2009 and 2011 were less than the federal income tax owed by $25,884 and $81,513, respectively. The federal tax liability for 2011 was paid by check number 5323 dated April 16, 2012, and drawn on their joint checking account at United Security Bank.

The parties' *California* income tax returns for 2009 through 2011 show overpayment of taxes of $1,969 and $3,207 in 2009 and 2011, respectively. Most of the overpayments were applied to estimated tax payments for the next year. The 2010 return shows they underpaid their taxes and owed $9,438 when the return was completed.

## 3. David's Estimated Tax Payments for 2012

The parties' 2012 income tax returns are not part of the appellate record. However, information about their estimated tax payments for the 2012 tax year is available. Their accountant's April 16, 2012, letter recommended making federal quarterly estimated tax payments of $40,000 each. The payments for the first and second quarter were made in April and June 2012 from the parties' joint checking account using checks numbered 5322 and 5464.

The accountant also recommended making quarterly estimated tax payments to California's Franchise Tax Board of $24,000, $32,000, $0 and $24,000 ($80,000 total). The parties made the first two payments to the Franchise Tax Board using electronic transfers from their joint checking account.

### 4.    *David's 2013 Federal Tax Payments and Refund*

A redacted excerpt from David's 2013 federal income tax return shows he had federal withholdings of $8,374 and made estimated tax payments of $140,000. David's total payments of $148,374 exceeded his total federal income tax liability by $38,491. David requested a refund of $38,478 and applied the other $13 to pay an estimated tax penalty. We note David's 2013 tax return had not been prepared when the trial court ordered temporary child support in October 2013 and, therefore, the information in that return about the overpayment of federal income taxes and the related refund was not available to the court at that time.

### 5.    *Federal and State Tax Payments and Refunds—2014 and 2015*

David's 2014 federal and California income tax returns are part of the appellate record. His total income on his federal return was $681,726, of which $84,236 was wages and $588,289 was his reportable S corporation income. David's total federal tax liability was $174,412. He had withholdings of $9,256 and made estimated tax payments of $240,000. These payments exceeded his federal income tax liability by $74,844, of which $74,804 was refunded to David and $40 was applied to an estimated tax penalty.

David's California income tax return for 2014 showed his state income tax payments totaled $123,214 and exceeded his tax liability by $19,454. David requested the overpayment of $19,454 be refunded to him.

Accordingly, David's federal and state refunds for 2014 totaled $94,258 ($74,804 plus $19,454). To place this figure in context, it equaled 112 percent of the wages David reported on line 7 of his federal income tax return and almost 14 percent of the total income he reported on line 22. Stated from a cash flow perspective, David's total tax refunds for 2014 exceeded the net amount of his paychecks for the year.

When the bench trial was held in October 2015, the 2015 tax year had not yet closed and David's tax returns for 2015 were not available. Therefore, the parties and court could not determine the amounts of state and federal income taxes actually paid for

35.

2015 as a matter of historical fact. In contrast, final information for 2014 was available and was presented to the court. Therefore, the court could have determined the amount of state and federal income tax liability actually paid for 2014 and the amount of the 2014 refunds received in 2015.

### 6. *Ownership of the Tax Refunds*

David has relied on his argument that the issues arising from the child support award in the June 2016 judgment are moot and has not specifically addressed Launa's argument that his tax refunds are part of his net disposable income for purposes of section 4059. However, David has presented an argument about ownership of the tax refunds in responding to Launa's arguments about spousal support. Accordingly, we will consider David's argument about the ownership of the tax refunds in our analysis of the child support award contained in the June 2016 judgment.

David contends his federal income tax refund of $74,804 for the 2014 tax year should not be considered part of his income available for spousal support because it belongs to Huddleston Crane and, thus, is not available to him.

First, we conclude David's argument that one or both S corporations own the tax refunds is not supported by direct evidence. There is no direct evidence that David actually transferred the refunds to either S corporation. In addition, there is no evidence of a contractual or other obligation requiring David to transfer the refund to either S corporation. For example, nothing in the corporate bylaws or articles of incorporation impose such an obligation on David.

Second, we conclude the circumstantial evidence is insufficient to support the inference that David transferred the refund to the S corporations or was obligated to make such a transfer. David acknowledges that he testified he received the federal tax refund, but notes that (1) Launa's attorney did not ask him if he returned the tax refund to the company and (2) his accountant's 2013 testimony established that the corporation was

36.

paying the taxes for David. The accountant's testimony resulted from a question about whether the accountant knew, based on his records, how much David "has historically been paid in cash flow." The accountant replied:

> "Historically, as a general rule, normally—the business philosophy of Huddleston Crane is to take amounts out of the company sufficient to pay the income taxes reported on their individual income tax returns. So specifically the account amount of 2011—I don't have a financial statement sitting in front of me—I couldn't tell you what that number is."

This vague testimony does not address the subject of income tax refunds. David also cited testimony in which Noerr stated he made the decisions as to how much money the company distributed to the owners and he had denied requests by David to distribute additional money.

We have reviewed the accountant's testimony, Noerr's testimony and the other evidence cited by David. In addition, we have considered the inferences that might be drawn from how David and Launa dealt with prior income tax refunds. In particular, the record shows how the $17,905 refund received in 2011 as a result of the overpayment of the federal income taxes for the 2010 tax year was handled. Also, a February 11, 2014, letter from David's attorney to a certified public accountant states various back-up documentation was enclosed, including a copy of "a United States Treasury refund check in the amount of $17,905 reflecting an overpayment of income taxes, as well as a copy of the deposit slip depositing the money into the parties' joint United Security Bank account." A copy of the letter's enclosures is not part of the appellate record, but a schedule of deposits made into the United Security Bank account during 2011 confirms the $17,905 refund was deposited on May 3, 2011. We have reviewed the monthly bank statements for 2011 and have located no evidence showing the refund amount was transferred to one of the S corporations. The bank statements show the federal ($20,000) and California ($16,556) estimated tax payments were made by checks and were covered by a deposit of $36,556 made on June 16, 2011. Therefore, the $17,905 refund was not

37.

used to partially fund the estimated tax payments made the month after the refund was received.

Based on our review of the record, we conclude the evidence does not reasonably support the inference that the S corporations owned David's income tax refunds or, alternatively, that David returned the tax refunds to the corporations. Noerr's business philosophy of retaining earning and avoiding borrowing is insufficient to provide reasonable support for the inference that David's tax refund belonged to the corporations. Rather, David's claim he did not own the refunds is based on conjecture and speculation[9] and contradicts the treatment of the federal income tax refund received in 2011. Accordingly, we reject David's ownership theory and his implied argument that his tax refunds were not part of his annual net disposable income for purposes of calculating child support.

### 7. Error in the June 2016 Judgment

The June 2016 judgment continued the child support awarded in October 2013. It follows that the June 2016 child support award could not have reflected (1) the federal income tax refund David received in 2014 due to the overpayment of his 2013 income taxes or (2) the California and federal income tax refunds David received in 2015 due to his overpayment of taxes on his 2014 income. As a result, the June 2016 child support award contains error in its underlying determinations of David's income for purposes of child support. The $94,258 in state and federal income tax refunds David received in

---

[9] Based on the record before this court, it appears any payment of federal and state estimated tax payments by the S corporations on behalf of David and Noerr would have reduced the capital account of the owner who benefited. Conversely, if David or Noerr had returned a tax refund to the S corporations, that infusion of money into the corporation probably would have been accounted for as a contribution to capital with a corresponding increase in that owner's capital account. Financial records reflecting changes to the owners' capital accounts in the S corporations are not part of the appellate record.

2015 was money actually available for child support[10] and its exclusion from the trial court's calculation of David's net monthly nontaxable income available for support or from his annual net disposable income for 2015 was error.

On remand, the calculation of David's income for purposes of child support must include the state and federal income tax refunds he received in 2015. If the court calculates David's income for 2014, that calculation must include the tax refunds David received in that year.[11]

F.    2016 Child Support—Contributions to 401(k) Plan

1.    *Background*

Launa contends David's gross monthly income of $9,151 was improperly reduced by his nontaxable, voluntary contributions to the 401(k) plan. Launa (1) interprets the trial court's written decision as stating David's contributions to the 401(k) plan were income available for support and (2) contends the court acted contrary to its statement when it failed to include the contributions in calculating David's net monthly after-tax income as $5,001. Launa's contention is based on the following statement in the October 2013 order's discussion of child support: "The court notes that the determination of income available for support also includes the 401(k) deduction that is made from [David's] check each month." Launa interprets this statement as an expression of the court's intention to include David's contributions to the 401(k) plan in his income

---

**10**     The fact that federal law authorizes local child support agencies to enforce child support orders by intercepting federal income tax refunds (42 U.S.C. § 664) demonstrates that income tax refunds are available to pay child support.

**11**     We note the exclusion of the tax refunds from these years is not justified by the possibility that income tax refunds might not be received in subsequent years. For purposes of David's child support obligation, which ended on June 1, 2016, what might occur in subsequent years is of little practical significance to the funds available to David to pay child support until June 1, 2016. In comparison, David's receipt of refunds in 2014 and 2015 prior to the termination date affected the amount of funds available to him to pay child support through the termination date.

available for temporary child support. Launa contends the court's DissoMaster calculations failed to implement this intent because it factually did not include the contribution as part of David's income available for support. Launa contends the error was repeated in 2016 when the court continued the child support it ordered in 2013.

### 2. Voluntary Contributions as Disposable Income

We conclude that, as a general rule, voluntary contributions to a 401(k) plan are properly included in net disposable income for purposes of calculating child support. (See §§ 4058 [annual gross income], 4059, subd. (c) [deduction of contributions to retirement benefits if required as a condition of employment].) Those contributions, because they are voluntary, represent funds available to the contributing parent to spend as he or she desires. (*Halpert & Leonard* (1998) 157 Ore. App. 276, 279 [970 P.2d 253, 254].) When a trial court excludes voluntary contributions to a 401(k) plan from the calculation of a parent's net disposable income, a rationale for deviating from the general rule should be set forth in the record. (§ 4056.)

In the procedural context presented by this appeal, we need not discuss Launa's interpretation of the October 2013 order. It is sufficient for our analysis that the record shows David's contributions to the 401(k) plan were not included in the October 2013 or June 2016 calculation of his net disposable income available for child support and the trial court did not explain the exclusion of the contributions. Accordingly, on remand when the trial court is addressing the other errors in the child support award in the 2016 judgment, the court also shall include the 401(k) plan contributions in calculating David's income available for child support or, alternatively, provide findings that justify the exclusion of all or part of those contributions. We note those contributions do not qualify for the *mandatory* deduction set forth in subdivision (c) of section 4059, which relates to retirement contributions that are required as a condition of employment. The record

40.

contains no evidence David's employment was conditioned on his participation in the 401(k) plan.

G.       2016 Child Support—Contributions to Health Savings Account[*]

Launa also contends David's gross monthly wage income of $9,151 was improperly reduced by his voluntary contributions to an HSA.[12]  Launa argues the trial court failed to exercise its jurisdiction (i.e., discretionary authority) to include or exclude the HSA contributions when determining David's income available for child support. These contentions, which are similar to the contentions about the contributions to the 401(k) plan, can be addressed on remand when the trial court addresses the other issues relating to the child support award in the June 2016 judgment.

H.       2016 Child Support—David's Rental Income and Expense[*]

David's November 2012 declaration stated that the business is organized as two corporations.  Huddleston Crane Services, Inc. is the operating company and H.C.S. Mechanical, Inc. owns equipment used by the operating company.  The declaration stated David and Noerr each receive two monthly checks for equipment rental totaling $10,150—one for $6,100 and the other for $4,050.  The declaration stated David used $2,500 of this rental income to pay his mother for the business's use of certain real estate. As a result of these transactions, David asserts he receives a net rental income of $7,650 per month.  Similar testimony was presented at a January 2013 hearing.  The banking records show many checks predating the dissolution proceeding, drawn on the parties' joint checking account, and made payable to David's mother, Eula Morton, in the amount of $2,500 for "rent."

---

[*]       See footnote, *ante,* page 1.

[12]       Contributions to the HSA and related deductions and distributions are reported on federal tax form 8889.  David reported contributions of $5,900 in 2011 and $3,300 in 2014.

[*]       See footnote, *ante,* page 1.

Launa contends the trial court erred in reducing David's monthly rental income of $10,150 by an alleged monthly payment of $2,500 when it determined his income available for payment of permanent child support. Launa contends the alleged monthly payment to David's mother is a sham and notes that David did not list it in a November 2012 income and expense declaration or a May 2015 loan application.

The trial court addressed Launa's arguments in its proposed statement of decision and in the attachment the June 2016 judgment. The attachment stated:

> "[Launa] claims the rental income paid to [David's] mother is a sham. Evidence before the Court in the nature of the testimony of [David] and … Noerr is sufficient to support the Court's finding that the Respondent is making a $5,000 per month rental payment."

The statement about David making a $5,000 monthly payment is incorrect because David paid one-half ($2,500) while Noerr paid the other half.[13] Nonetheless, the trial court's statement demonstrates it considered Launa's argument that the rental payment was a sham, and rejected it because it found the testimony of David and Noerr about a *total* rental payment of $5,000 to be credible.

Launa's challenge to the trial court's finding of fact relating to the rent paid to David's mother essentially fails to acknowledge that a finding of fact is reviewed under the substantial evidence standard. (*Alter*, *supra*, 171 Cal.App.4th at pp. 730–731.) Here, the trial court's findings about the monthly rental payment to David's mother is supported by substantial evidence in the form of David's testimony, Noerr's testimony, and the copies of checks from David to his mother for "rent" in the amount of $2,500. Therefore, we conclude Launa has failed to demonstrate the trial court committed factual

---

**13** The trial court's October 22, 2013, order accurately described David's share of the rental payment to his mother by stating: "Out of the $10,[15]0 monthly rental income, [David] pays his mother $2,500, which represents his share of the $5,000 monthly rent paid to her for Huddleston Crane Services, Inc.'s use of certain land to which she hold[s] title."

error in finding David made a $2,500 monthly rental payment to his mother for real estate and that money was not available for the payment of child or spousal support.

## I. Challenge to 2013 Temporary Child Support Order[*]

The child support order in operation until their youngest child graduated from high school was the temporary support order entered in October 2013. Consequently, we turn to Launa's challenges to that child support award.

### 1. Launa's Claim of Error

Launa contends the trial court erred in refusing to correct its October 2013 order of temporary child and spousal support on the grounds that (1) her request for reconsideration was untimely and (2) the court was not persuaded there was cause to correct the prior order. Launa refers to the court's inherent power to reconsider previous orders and cites *Le Francios v. Goel* (2005) 35 Cal.4th 1094 (*Le Francios*) as support. In her view, the court's statement that her motion for reconsideration was untimely was factually incorrect and, furthermore, she demonstrated the 2013 findings and DissoMaster calculations contained errors.

### 2. David's Contentions

David contends Launa's arguments mischaracterize the trial court's rationale for denying her request. He contends the court's reference to untimeliness refers to the time constraint applied to Launa's statutory right to request reconsideration, not a time limit that applies to the court's inherent authority to reconsider. David interprets the court's statement that it was not persuaded there was cause to correct its prior orders to mean the court determined its order of temporary support was correctly decided. In David's view, Launa's remedy was a timely appeal from the October 2013 order of temporary support or a motion to modify the support orders. David argues that, contrary to Launa's contention, *Le Francios* does not require a court to retroactively modify an erroneous

---

[*]    See footnote, *ante,* page 1.

support order.  Furthermore, David contends the temporary support orders were final and, therefore, the court lacked jurisdiction to retroactively modify them.

### 3. Launa's Reply

Launa's reply brief disagrees with David's contention about the lack of jurisdiction.  In her view, the trial court retained inherent jurisdiction to modify is prior orders.  In addition, Launa contends the court's failure to correct its orders of temporary support was an abuse of discretion.

### 4. Trial Court's Decision

The attachment to the June 2016 judgment stated (1) previous temporary orders were based on the trial court's determination of $12,651 as David's net monthly nontaxable income available for support and (2) the determination was based on the court's "consideration of testimony and evidence presented in a prior hearing and included in the orders filed October 22, 2013."  The footnote at the end of this statement reads:  "[Launa] requests in her closing argument that the Court reconsider this determination of income available for support and 'correct' the previously issued temporary orders to reflect [David's] determination of his actual income.  That request for reconsideration is not timely under Code of Civil Procedure section 1008 nor is the Court persuaded that there is cause to 'correct' the prior orders."

### 5. General Principles

An order granting or denying temporary child support is appealable.  (*County of Yolo v. Worrell* (1989) 208 Cal.App.3d 471, 474, fn. 6; see *In re Marriage of Gruen, supra,* 191 Cal.App.4th at p. 637 ["temporary support order is operative from the time of pronouncement, and it is directly appealable"].)  A family law practice guide provides the following pointer:

> "The failure to file a timely appeal from a directly appealable 'final'
> pendente lite order will forever bar the right to challenge the order; once the
> time for appeal has run, the order will be entitled to res judicata effect even

if erroneous!" (1 Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2018) ¶ 5:534.3a, pp. 5-254, 5-255.)

An application for reconsideration of an order is governed by Code of Civil Procedure section 1008. As to the timing of the application, the statute provides any party affected by an order may, "within 10 days after service upon the party of written notice of entry of the order," make application to the same court to reconsider the matter and modify or revoke the prior order. (Code Civ. Proc., § 1008, subd. (a).)

### 6. *Timeliness*

As to Launa's claim that the trial court erred in finding her motion for reconsideration was untimely, we note the court's finding specifically referenced timeliness *under Code of Civil Procedure section 1008*. The court did not find the motion was untimely for all purposes. Here, Launa has not established that her application was filed within the 10 days specified by statute. Consequently, she has not established the trial court's finding as to statutory untimeliness was erroneous.

### 7. *Inherent Discretionary Authority to Reconsider*

Launa relies on *Le Francios* as establishing the following rule about a trial court's authority to reconsider prior orders: "In response to a party's suggestions, the Court has the inherent power to reconsider its previous order on its own motion (*sua sponte*) at any time before the entry of judgment, so long as it gives the parties notice and a reasonable opportunity to litigation the question." David concedes that Launa accurately stated the holding of *Le Francios*. We assume for purposes of discussion that Launa's suggestion that the trial court exercise the discretionary authority described in *Le Francios* was timely because she made it prior to the entry of the June 2016 judgment.

Launa's arguments imply that a showing of an abuse of this inherent, discretionary authority is established once the suggesting party has demonstrated the prior order contains error. We reject this implication and conclude many more factors are relevant to the trial court's exercise of this inherent authority. In particular, the trial court may

consider the reasons for appellant's failure to (1) file a timely motion under Code of Civil Procedure section 1008 or (2) make an earlier suggestion that the trial court exercise its inherent authority. Stated otherwise, an unreasonable delay is a rational ground for refusing to exercise the inherent discretion. Here, Launa has not explained her delay in asking for the correction of the October 2013 order in a way that establishes the trial court acted unreasonably in determining she had not shown "cause" for the exercise of the court's inherent authority.[14] Thus, it was reasonable for the trial court to decline to exercise its inherent discretionary power on the ground Launa did not offer a good enough reason for her delay. Therefore, we conclude the trial court did not abuse its discretion in rejecting her suggestion that the October 2013 order be corrected. Based on this determination, we need not address the other grounds presented by David for upholding the trial court's decision not to reconsider its prior order.

## III. SPOUSAL SUPPORT*

### A. General Principles

California law provides for two distinct types of spousal support—temporary and permanent. (*In re Marriage of Mendoza & Cuellar* (2017) 14 Cal.App.5th 939, 942–943 (*Mendoza*); see §§ 3600 [spousal support during pendency of dissolution proceeding], 4330 [spousal support upon dissolution of marriage].)

#### 1. Temporary Spousal Support

The two types of spousal support do not serve the same purpose and are not governed by the same procedures. (*Mendoza*, *supra*, 14 Cal.App.5th at p. 942.) In other

---

**14** By comparison, the reasonableness of a delay is a factor in determining the timeliness of a motion to disqualify an attorney. (See *Ontiveros v. Constable* (2016) 245 Cal.App.4th 686, 701.) Also, facts showing a delay in asserting a claim was reasonable under the circumstances precludes the application of California's laches doctrine. (See *Magic Kitchen LLC v. Good Things Internat., Ltd.* (2007) 153 Cal.App.4th 1144, 1157 [elements of laches].)

\* See footnote, *ante,* page 1.

words, temporary allowances and permanent allowances differ fundamentally in nature and function. (*Ibid*.) Temporary spousal support is meant to allow a spouse to continue to live in the manner to which he or she is accustomed while the dissolution proceeding is pending. (*Id*. at pp. 942–943.) In other words, temporary spousal support is designed to preserve the pre-separation status quo. (*In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 507; 11 Witkin, Summary of Cal. Law (11th ed. 2017) Marriage, § 245, p. 301.) Temporary spousal support, like an interim award of attorney fees and costs, also may be used to provide a spouse with the resources needed to litigate properly his or her side of the controversy. (*Mendoza*, *supra*, at p. 943.)

2.      *Permanent Spousal Support*

In contrast to temporary spousal support, the purpose of permanent spousal support is to provide financial assistance, if appropriate, as determined by the financial circumstances of the parties after their dissolution and the division of their community property. (*In re Marriage of Burlini* (1983) 143 Cal.App.3d 65, 68.) Some courts state permanent spousal support "is intended to make an equitable apportionment between the parties." (*Mendoza*, *supra*, 14 Cal.App.5th at p. 942.) The main statutory provisions governing permanent spousal support are sections 4320 and 4330.

Section 4330 states the trial court "may order a party to pay for the support of the other party an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in Chapter 2 (commencing with Section 4320)." (§ 4330, subd. (a).) The marital standard of living is not an absolute measure (either as a floor or a ceiling) of spousal support, but is a reference point against which the statutory factors may be weighed. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 485; *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 48, fn. 11.)

Section 4332 requires the trial court to "make specific factual findings with respect to the standard of living during the marriage."

Section 4320, subdivisions (a) through (n), set forth multiple factors a trial court must consider in making a permanent spousal support order. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 308.) These include, among other things, the extent to which a party's earning capacity is sufficient to maintain the marital standard of living; the marketable skills of the supported party; the job market for those skills; the ability of the supporting spouse to pay spousal support; the needs of the parties given their standard of living; the parties' obligations and assets; the duration of the marriage; the ability of the supported party to engage in gainful employment; the age and health of the parties; and any other factors the court deems just and equitable. (§ 4320.) Evaluating the ability of the supporting spouse to pay support involves the consideration of the supporting spouse's "earning capacity, earned and unearned income, assets, and standard of living." (§ 4320, subd. (c).)

Trial courts are required to weigh the factors set forth in section 4320, but have discretion in completing the weighing process. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 304; see *In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 594 [discretion in determining permanent support is constrained by statutory factors set out in § 4320].) This discretion must be exercised fairly with the goal of accomplishing substantial justice for the parties. (*Cheriton*, *supra*, at p. 304.) Trial courts do not have the discretion to ignore any relevant circumstance enumerated in the statute. (*Ibid.*) Therefore, trial courts must both recognize and apply each statutory factor when setting permanent spousal support. (*Ibid.*) A failure to do so is reversible error. (*Ibid.*) Stated another way, "the 'court may not be arbitrary; it must exercise its discretion along legal lines,

taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and their financial abilities.'" (*Ibid.*)[15]

The differences in the purposes of temporary and permanent support and in applicable statutory text has generated the principle that reliance on temporary support schedules in making permanent support is wholly improper. (See *In re Marriage of Burlini*, *supra*, 143 Cal.App.3d at p. 69 [inappropriate to rely on local support schedule for temporary support to determine permanent spousal support].) Thus, it is error to base a permanent spousal support award on a computer program designed to calculate temporary support. (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 525.)

### B.     Trial Court's Decision

The trial court set permanent spousal support at $2,700 per month, commencing on April 1, 2016, and continuing until terminated by statute or further order of the court. About 10 pages of the attachment to the June 2016 judgment set forth the trial court's analysis and findings in support of that award. The court addressed the marital standard of living, which it described as "a benchmark against which the factors in section 4320 may be weighed." Before addressing the factors in section 4320, the court addressed "the issue of income available for support."

The trial court noted its temporary support orders had been based on its determination that $12,651 of net monthly nontaxable income was available for support, of which $7,650 was net rental income and the remaining $5,001 was wages available for support. The court appears to have readopted that finding as it rejected six arguments presented by Launa "regarding why this determination of income should be revisited for purposes of setting permanent spousal support." The court's discussion of the factors

---

**15**     Due to the overlap between the factors listed in section 4320 and the factors that must be considered in awarding attorney fees and costs, section 4320 and the attorney fee provisions have been described as forming a "statutory package." (*Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 641; see part IV., *post* [attorney fees].)

listed in section 4320 addressed David's ability to pay spousal support taking into account his earning capacity, income, assets and standard of living. (§ 4320, subd. (c).) The court stated David's "current earnings are discussed above." That prior discussion related to (1) the court's previous finding that David's net monthly nontaxable income was available for support was $12,651[16] and (2) the court's rejection of Launa's arguments for increasing that amount. Accordingly, we interpret the decision as finding David's income available for permanent spousal support was approximately $12,651 per month.

C.    David's Income and Ability to Pay

Launa raises several challenges to the trial court's findings as to David's income available for spousal support. Some of those grounds also were raised in Launa's challenges to the award of child support, such as income tax refunds and sham rental payments to his mother.

1.    *Income Tax Refunds*

In part II.E., *ante*, we discussed David's California and federal income tax refunds in the context of child support. Our determinations about tax refunds being income available to pay child support also apply in the context of a spouse's ability to pay spousal support, which takes into account that spouse's income and assets. (See § 4320, subd. (c).) Therefore, we conclude the trial court erred when it excluded the California and federal income tax refunds received by David in its calculation of his after-tax income for purposes of spousal support.

---

**16**    The court also described this figure as David's "net after-tax income," which the court found was the relevant income measurement because the S corporations retained earnings rather than distributing all the income to the owners, which resulted in David having a taxable income much higher than the cash flow he received from the corporations. The retained earnings attributable to David are, of course, part of his "earning capacity" referenced in subdivision (c) of section 4320.

The trial court determined David's after-tax income was approximately $12,651 per month. The federal and California income tax refunds David received in 2015 for the 2014 tax year totaled $94,258 ($74,804 plus $19,454). When spread over the year of receipt, the refunds averaged over $7,850 per month. This monthly average exceeded David's net rental income of $7,650 per month. It also exceeded his monthly wage after taxes. The exclusion of this large source of after-tax income constituted an abuse of discretion even though the amount of any future state and federal income tax refunds may be difficult to predict.

### 2. Net Rental Income

In part II.H., *ante*, we concluded the trial court's finding that David's net rental income was $7,650 per month was supported by substantial evidence. The change of context from the child support award to the determination of David's income available to pay permanent spousal support does not alter our conclusion that substantial evidence supports the trial court's finding as to net rental income. Accordingly, we conclude the trial court did not commit factual error in (1) finding David made a $2,500 rental payment to his mother for real estate and (2) deducting that payment from the rental payments totaling $10,150 that David received each month.

### 3. Contributions to 401(k) Plan

Before and after the filing of this dissolution proceeding, David made contributions to the 401(k) plan through paycheck deductions. In 2014 and 2015, David contributed $317 from each weekly paycheck. Over a 52-week period, these contributions would total $16,484, which is the equivalent of $1,373.67 per month.

We conclude David's voluntary contributions to the 401(k) plan constitute earned income for purposes of section 4320, subdivision (c). (See *Gillis & Gillis* (2010) 234 Ore. App. 50, 55 [227 P.3d 809, 812] [contributions husband voluntarily made to qualified retirement plan are properly treated as part of his income for purposes of

51.

spousal support]; *Geoghegan v. Geoghegan* (Fla.App. 2007) 969 So.2d 482, 486 [husband's contributions to 401(k) plan, as voluntary payments, should have been considered by trial court in calculating his ability to pay spousal support].) Accordingly, the trial court's determination that David's net monthly nontaxable income available for support was approximately $12,651 was erroneous because it excluded David's contributions to the 401(k) plan.

In addition to being relevant to David's current ability to pay spousal support, the contributions to the 401(k) plan are relevant to (1) the standard of living of David and Launa during their marriage and (2) their respective standards of living after the dissolution of the marriage. Contributions to a 401(k) plan are a specific type of savings and, as such, are part of the parties' standard of living during the marriage. (*In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086, 1096.) Savings may be considered as form of deferred expenditure or planned future consumption. (*Id*. at p. 1097.) Here, David was able to continue savings through the 401(k) plan and, thus, improved that aspect of his standard of living as the postseparation contributions are no longer characterized as community property. In contrast, Launa has not been able to maintain that aspect of her prior standard of living.

On remand, the trial court's redetermination of David's income available for spousal support shall include David's voluntary contributions to the 401(k) plan and its evaluation of the parties' standard of living and shall consider whether the permanent spousal support ordered provided an amount sufficient to enable Launa to continue saving at the level attained during the marriage.

4. *Contributions to Health Savings Account*

Like voluntary contributions to a 401(k) plan, voluntary contributions to a medical savings account such as an HSA should be considered in determining a party's ability to pay spousal support. (*Geoghegan v. Geoghegan*, *supra*, 969 So.2d at p. 486.)

Accordingly, on remand, the trial court's redetermination of David's income available for spousal support shall include David's voluntary contributions to the HSA, which was $118 per week in 2015 and equates to $511.33 per month.

## IV.    ATTORNEY FEES

### A.    Statutory Provisions

Chapter 3.5 of part 1 of division 6 of the Family Code contains sections 2030 through 2034, which govern the award of attorney fees in marriage dissolution proceedings.  Sections 2030 and 2032 contain the statutory text applicable Launa's claims that the trial court erred in denying her request for additional attorney fees.

#### 1.    Historical Overview

The history of section 2030 and its predecessors has been described in published decisions and will not be repeated in detail here.  The Second District traced the lineage of section 2030 back through its immediate predecessor, former Civil Code section 4370, to former Civil Code section 137, which was enacted in 1872.  (*In re Marriage of Hobdy* (2004) 123 Cal.App.4th 360, 368–369.)  Section 2030 was enacted in 1993 and did not make substantive changes to former Civil Code section 4370.  (*In re Marriage of Hodby, supra,* at p. 369; see Stats. 1993, ch. 219, § 106.1, pp. 1607–1608.)

As a general principle, when new legislation amends statutory text by substituting the word "shall" for "may," the new legislation has restricted the discretionary authority previously granted under the statute.  (See § 12 ["'Shall' is mandatory and 'may' is permissive"].)  The version of section 2030 enacted in 1993 stated the trial court "may … order" attorney fees in certain circumstances.  (Stats. 1993, ch. 219, § 106.1, pp. 1607–1608.)  The 2004 amendment deleted the word "may" and inserted text that used the word "shall" four times.  (Stats. 2004, ch. 472, § 1, p. 3057.)  The 2010 amendment modified section 2030 to include text stating "the court shall make findings" and stating "the court shall make an order awarding attorney fees and costs" if the findings

demonstrated certain conditions. (Stats. 2010, ch. 352, § 4, p. 1819.) The textual changes made by the 2004 and 2010 legislation demonstrate that the discretionary authority granted to trial courts is not as broad as it once was and, currently, trial courts must comply with certain mandatory provisions. (See *Kevin Q. v. Lauren W.*, *supra*, 195 Cal.App.4th at pp. 639–640 [2004 amendment restricted trial court's discretion].)

Accordingly, we conclude the "broad discretion" referred to in judicial decisions discussing the version of 2030 predating the 2004 and 2010 amendments no longer exists. (See e.g., *Cheriton*, *supra*, 92 Cal.App.4th at p. 314 ["trial courts enjoy broad discretion in awarding attorneys' fees in marital proceedings"].) The Legislature has imposed limitations on that discretion and it is no longer accurate to refer to a trial court's "broad discretion" when describing a trial court's responsibilities under section 2030 as currently in effect.

### 2. *Statutory Text*

The current version of subdivision (a) of section 2030 provides:

"(1) In a proceeding for dissolution of marriage, … and in any proceeding subsequent to entry of a related judgment, the court *shall* ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, except a governmental entity, to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding.

"(2) When a request for attorney's fees and costs is made, the court *shall* make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court *shall* make an order awarding attorney's fees and costs. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented

54.

party to retain an attorney in a timely manner before proceedings in the matter go forward." (Italics added.)

The word "shall" in this subdivision has been italicized to emphasize the mandatory nature of the provision. The first two sentences of section 2030, subdivision (a)(2) were enacted in 2010 as part of Assembly Bill No. 939 (2009-2010 Reg. Sess.), which became effective on January 1, 2011. (See Stats. 2010, ch. 352, § 4, p. 1819; *In re Marriage of Cryer, supra,* 198 Cal.App.4th at p. 1055, fn. 4; Cal. Const., art. IV, § 8, subd. (c)(1) [effective date of statute].) When considering an application for attorney fees, the trial court must comply with the mandatory provisions of the statute because discretionary authority "must be exercised within the confines of the applicable legal principles." (*Saragon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

### 3. *Interpreting the Text—Findings Must Be Explicit*

The first question of statutory interpretation we consider involves the language stating "the court shall make findings" on three specific questions and whether the findings must be explicit (i.e., written or oral) or, alternatively, may be implicit. We conclude the findings must be explicit.

Our Supreme Court interpreted language in former Civil Code section 4600, a provision in the Family Law Act relating to an award of custody of a child to a nonparent. The provision stated the court "'must make a finding that an award of custody to a parent would be detrimental to the child.'" (*In re B.G.* (1974) 11 Cal.3d 679, 695.) Our Supreme Court determined this statutory text required an express finding. (*Id.* at p. 683.) The phrase "shall make findings" is similar to the phrase "must make a finding" because "shall" and "must" are routinely construed as mandatory. (*Jones v. Catholic Healthcare West* (2007) 147 Cal.App.4th 300, 307.) Therefore, we conclude the phrase "the court shall make findings" requires the court to make express findings—that is, findings stated in words, either in writing or orally on the record. (§ 2030, subd. (a)(2).)

The next legal question presented is whether the failure to make explicit findings on the three questions set forth in the statute warrants automatic reversal or, alternatively, whether the appellant must establish the error was prejudicial. We conclude California's constitutional doctrine of reversible error applies and requires the appellant to establish prejudice. (Cal. Const., art. VI, § 13.) An appellant in a civil case establishes an error was prejudicial by showing there is "a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)

B.      The Trial Court's Denial of Additional Fees

The trial court's October 2013 order granted Launa a pendente lite award of attorney fees in the amount of $15,000. The order stated the award was without prejudice to future requests by Launa for additional attorney fees.

After the October 2015 trial, Launa's lawyer submitted a declaration requesting additional attorney fees of approximately $115,000. In addressing this request, the trial court's April 2014 proposed statement of decision identified sections 2030 and 2032 as the statutory basis for an award of attorney fees and quoted *In re Marriage of Sharples* (2014) 223 Cal.App.4th 160 and *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238— judicial decisions that discussed those sections and other principles. The court stated: "While the court has discretion in fashioning an attorney fee award, its decision must reflect an exercise of discretion and a consideration of the appropriate factors as set forth in sections 2030 and 2032." The trial court supported this statement by citing *Alan S.*, a case decided before the 2010 amendment added the following sentence to section 2030, subdivision (a)(2): "If the findings demonstrate disparity in access and ability to pay, the court *shall* make an order awarding attorney's fees and costs." (Italics added.) The trial court's description of applicable legal principles did not quote or summarize this mandatory sentence or the following language from subdivision (b) of section 2032:

56.

"The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested."

The court's written decision then noted the total amount of Launa's request for attorney fees, the fact $15,000 had previously been awarded to her, and stated her net request sought an additional $115,134.65 in attorney fees. The court analyzed her request by stating:

> "In evaluating the relative financial circumstances of the parties, the Court notes that both parties obtained a significant amount of money from the sale of the family residence, each receiving approximately $300,000. Both parties also received a significant distribution of funds from the parties' 401k plan. Under the circumstances, there is no demonstrated need for an order that [David] pay for her attorney's fees. Both parties have sufficient resources to pay for their own attorney's fees and costs."[17]

Details about the assets Launa received from the division of community property are contained in the March 2016 judgment of reserved issues. It stated Launa would receive (1) one-half of the remaining net proceeds generated by the sale of the family residence, which proceeds totaled approximately $295,084; (2) one-half of the 401(k) plan, which had a balance of approximately $285,150 as of July 31, 2012; and (3) one-half of a brokerage account that had a balance of approximately $245,688 as of June 30, 2015. One-half of these figures is approximately $413,000. When added to the $150,000 of proceeds from the sale of the residence previously distributed, Launa's share of those assets totaled approximately $563,000.

C.     Claims of Error

Launa contends the trial court erred in awarding her no attorney fees beyond the $15,000 pendente lite award. First, Launa contends the court failed to consider her needs

---

**17**     The attachment to the June 2016 judgment contained essentially the same discussion of the attorney fees request as the proposed statement of decision.

when it denied her request. Second, she contends "the Court failed to exercise its discretion to make both a need and ability to pay analysis" because it did not properly include an evaluation of David's ability to pay. We need not discuss her first contention in detail because of our resolution of the second.

### 1. *Improper Analysis—Disparity and Ability to Pay*

Launa argues the trial court did not exercise its discretion properly, which requires an analysis of both the needs of the parties and their ability to pay. In her view, "[t]he Court should have analyzed the great disparity in the parties' incomes." Launa's reply asserts "[t]here is an obvious disparity between the parties' incomes."

Launa's references to the disparity in incomes and in other financial circumstances invokes the text of section 2030, subdivision (a)(2) that uses the term "disparity." That provision specifically states a trial court must make a finding on "whether there is a disparity in access to funds to retain counsel." The common and ordinary meaning of the word "disparity" is "[i]nequality; a difference in quantity or quality between two or more things." (Black's Law Dict., *supra,* at p. 504.) Here, the trial court's proposed statement of decision and its June 2016 judgment failed to include the statutorily mandated finding. Consequently, the court's decision failed to comply with a mandatory provision of the statute.

Launa also argues the trial court failed to make an ability-to-pay analysis, which is related to another question for which an explicit finding is required. Under section 2030, subdivision (a)(2), the trial court was required to make a finding on "whether [David] is able to pay for legal representation of both parties." The trial court's decision did not include this mandatory finding. Consequently, the court committed legal error by failing to comply with two mandatory provisions of section 2030, subdivision (a)(2).

### 2. *Appellate Relief*

Next, we consider the consequences of the failure to make the mandatory findings and how that affects the appellate relief granted by this court. (See Code Civ. Proc., §§ 43, 906.) One possibility is to remand with directions for the trial court to make those findings. Another possibility is to conclude the evidence in the record establishes the facts that render an award of attorney fees mandatory and, as a result, limit the further proceedings on remand to a determination of the amount of those additional attorney fees. Based on our review of the record, we conclude an award of attorney fees was mandatory and the amount of the award should be among the issues decided on remand.

Pursuant to section 2030, subdivision (a)(2), if the mandatory "findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." Here, the record demonstrates "a disparity in access to funds to retain counsel." Both parties have access to the funds resulting from the division of the community assets. However, David has access to the funds generated by (1) his employment and (2) his ownership of one-half of Huddleston Crane Services, Inc. and H.C.S. Mechanical, Inc. Specifically, he receives a weekly paycheck, net rental income of $7,650 per month, and other funds from the corporations, including funds to make quarterly estimated income tax payments that sometimes result in significant refunds. In particular, the most recent income tax refunds shown in the record establish that in 2015 David received federal and state refunds totaling $94,258 ($74,804 plus $19,454). In contrast, Launa's access to funds is limited to the funds obtained from the division of the community assets. Her income from employment was minimal before she stopped working as a courier and his does not own a revenue generating business. Accordingly, the record compels a finding of a disparity in access to funds for retaining and paying counsel.

In addition, the record demonstrates David "is able to pay for legal representation of both parties" and there is a disparity in the ability to pay for legal representation.

(§ 2030, subd. (a)(2).)  The disparity in the ability to pay for legal representation is established by the disparity in the parties' wages and salaries and Launa's lack of rental income or other business income.  The fact that Launa holds assets from the division of community property that are sufficient to cover her attorney fees does not negate the existence of the significant disparity in the ability to pay for legal representation.  (See § 2032, subd. (b).)  The long-term financial consequences of requiring Launa to liquidate those assets to pay for attorney fees—assets which, in contrast to David, she does not have the means to replenish—must be evaluated in determining the ability to pay.

Accordingly, if the trial court has explicitly found an insignificant "disparity in access and ability to pay" (§ 2030, subd. (a)(2)), that finding would have to be overturned for lack of sufficient evidentiary support.  Consequently, no purpose would be served by remanding to the trial court with instructions to make explicit findings on the three issues listed in subdivision (a)(2) of section 2030.  The record compels findings that make the award of attorney fees mandatory.  Accordingly, we remand for the trial court to determine the amount of those fees in the first instance.

D.      Attorney Fees on and after Appeal

Subdivision (c) of section 2030 states the trial court "shall augment or modify the original award for attorney's fees and costs as may be reasonably necessary for the prosecution … of the proceeding, or any proceeding related thereto, including after any appeal has been concluded."  Launa's appeal was reasonably necessary for the prosecution of the proceeding, but the amount reasonably necessary for her pursuit of this appeal and the further proceedings on remand is a matter to be resolved by the trial court in the first instance.  (See *In re Marriage of Schofield* (1998) 62 Cal.App.4th 131, 140–141.)

## DISPOSITION

The judgment is affirmed as to the characterization of David's ownership interest in the family business as his separate property and is reversed and vacated as to (1) child support, (2) spousal support, and (3) attorney fees.  The matter is remanded to the trial court for further proceedings not inconsistent with this opinion.

Launa Morton shall recover her costs on appeal.

_____

FRANSON, J.

WE CONCUR:


_____

DETJEN, Acting P.J.


_____

SMITH, J.